# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

ALBERT "CHUCK" RUSSELL,

        Plaintiff,

vs.                             No. _____

INDUCTEV, INC.,

        Defendant.

## COMPLAINT FOR BREACH OF CONTRACT, FRAUD IN THE INDUCEMENT, MISREPRESENTATION, PROMISSORY ESTOPPEL, INTERFERENCE WITH CONTRACT, DECLARATORY RELIEF, AND EQUITABLE RELIEF

Plaintiff Albert "Chuck" Russell ("Mr. Russell"), by and through counsel, Trent A. Howell, as Complaint against his former employer, Defendant InductEV, Inc. ("InductEV" or the "Company"), alleges as follows:

## NATURE OF CLAIMS

1.      This is a civil action for declaratory and equitable relief as well as monetary damages brought by Mr. Russell regarding InductEV's breach of contract, fraud in the inducement, misrepresentation, promissory estoppel, and interference with contract.

## JURISDICTION

2.      This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1332, as it asserts a claim with an amount in controversy exceeding $75,000, where there is complete diversity, with no Defendant domiciled in the same state as Plaintiff. For but part of the damages in question, InductEV promised and denied Mr. Russell 6,502,300 shares of InductEV stock. InductEV stock has a value of at least $.10 per share. In turn, the stock shares in controversy, alone, equal several times the jurisdictional amount of $75,000.

3.     Venue is appropriate because a substantial part of the actions complained of are conduct and employment practices of InductEV, who operates and employed Plaintiff within the District of New Mexico, by InductEV's own admission doing so subject to the employment laws of the State of New Mexico.  28 U.S.C. § 1391.  And such actions subject InductEV to the personal jurisdiction of the District of New Mexico as to this civil action.  *Id*.

PARTIES AND JURISDICTIONAL AND VENUE FACTS

4.     Plaintiff, Mr. Russell—at all relevant times a resident and domicile of Santa Fe County, New Mexico—is an industrial engineer with 35+ years experience in the automobile industry.  Mr. Russell worked as President and Chief Operating Officer ("COO") of InductEV from February 2023 through October 2023, under a written Offer Letter Agreement ("OLA"), executed on February 24, 2023 and attached as **Exhibit 1**.

5.     Defendant InductEV, a wireless-charging business for electric vehicles, is a Delaware corporation having its principal office at 660 Allendale Road, King of Prussia, Pennsylvania 19406 and having its Registered Agent as Corporation Service Company, 251 Little Falls Drive, Wimington, Delaware 19808.

6.     Upon information and belief, InductEV's Chief Executive Officer ("CEO"), Barry Libert ("Mr. Libert") maintains a primary residence and is domiciled in Sherborn, Massachusetts but has a second home and also resides in Las Campanas, Santa Fe County, New Mexico.

7.     InductEV recruited and hired Mr. Russell through actions located and directed in Santa Fe County, New Mexico, including by and through Mr. Libert, who made first and continuing recruiting contact with Mr. Russell in person in Santa Fe County, New Mexico.

8.     InductEV hired Mr. Russell to perform under the Agreements both on Company

premises in Pennsylvania and remotely, from his residence in Santa Fe County, New Mexico.

9.      At all relevant times, InductEV recorded Mr. Russell as having a permanent address in Santa Fe County, New Mexico and addressed its bi-weekly paychecks to Mr. Russell at his Santa Fe County residence.

10.     At the time of termination, InductEV's Director of People Operations, Diana Wilmes, acknowledged its employment of Mr. Russell was pursuant to New Mexico law by stating, "You will receive your final unpaid wages (unused accrued PTO), on Friday, November 3rd per the New Mexico Final Pay requirements." **Exhibit 2** (November 1, 2023 Email from Ms. Wilmes to Mr. Russell).

11.     By these circumstances and in ordinary course of its operations, InductEV does business and may be found in the County of Santa Fe, New Mexico.

12.     The wrongful employment and contract actions against Mr. Russell alleged herein were committed by InductEV from February 2023 through November 2023 in the State of New Mexico, including events of InductEV doing business, contracting, and engaging in employment/contract practices toward Plaintiff in the County of Santa Fe, New Mexico.

13.     The above facts make this action timely, confer jurisdiction over the parties and subject matter hereto in the District of New Mexico, and make this District a proper venue in which Plaintiff may file this lawsuit.

14.     Defendant InductEV is amenable to suit and subject to personal jurisdiction of the District of New Mexico as to each cause of action.

<u>SUMMARY OF CLAIMS AND KEY FACTS</u>

15.     This action is brought under and for redress of InductEV's acts in hiring Mr. Russell as President and COO under the OLA, enriching itself with benefits of that agreement for

3

300+ days, and then interfering with, terminating, and breaching the OLA on or about October 31, 2023.

16.     Based on his decades of experience in the automobile industry, Mr. Russell has extensive knowledge in manufacturing operations, supply chain, product development, quality operations, and program management to further the industrial needs of InductEV.  Mr. Russell was specifically asked to make significant financial and operational improvements to the company so it could successfully scale and become a viable exit candidate.

17.     Under the OLA, effective February 15, 2023, InductEV hired Mr. Russell to significantly improve its operations, exploit his auto industry contacts for investment, hiring and technological expertise, and enhance its new product programs.  Mr. Russell was acquainted with the domestic and global industry landscape and could expand the footprint of InductEV projects based on his prior experiences and contacts.  As "President and COO," Mr. Russell was to be a valued, respected, and integral part of the Executive Management Team, with primary responsibilities for InductEV Innovation, Engineering, Supply Chain, and Manufacturing.  Mr. Russell was to bring in his contacts and knowledge and build toward vendor, partner, and customer relationships.  In addition, the OLA required Mr. Russell to sign a Non-Disclosure, Non-Compete, and Confidential Information Invention Assignment Agreement ("CIIAA"), precluding him from working in any Competitive Position for a period continuing twenty-four (24) months following any termination of his employment by either InductEV or Mr. Russell, and further assigning to InductEV all intellectual property in any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, or know-how Mr. Russell developed while employed with InductEV.

18.     As inducement for Mr. Russell to provide these services, to enter these agreements, to forego any competitive position for at least two years, to assign his inventions, and to invest his experience, contacts, and intellectual capital into the organization, InductEV independently drafted the OLA to promise Mr. Russell the following, *verbatim*:

4.     Base Compensation:  $330,000 Annualized, with bi-weekly pay schedule
5.     Bonus Plan:  Up to 40%, subject to Board approval
6.     Equity:  6,502,300 shares
…
8.     Benefits:  Participation in all medical, dental and health programs
9.     401K:  Eligible for the Company plans

**Exhibit 1** (Offer Letter dated February 24, 2023), p. 1.

19.     Notably, in the OLA, InductEV clarified terms and conditions on some of these forms of consideration, such as stipulating:

a.     its promise of "Base Compensation" was "Annualized,"
b.     Bonuses were "subject to Board approval,"
c.     the promise of "Benefits" was simply for "Participation in all … plans," and
d.     the "401K" commitment was that he be "Eligible for the Company plans."

*Id.*

20.     But in its commitment to award Mr. Russell "Equity," InductEV specified no such restrictions.  *Id*.  Instead, the OLA promised outright shares numbering 6,502,300, with no contingency of any set time of service or other process or approvals.

21.     The OLA promised Mr. Russell "shares" and not mere "options" to purchase shares.

22.     Mr. Russell thus interpreted and relied upon the OLA as creating a contract entitling him to 6,502,300 shares of InductEV stock upon his acceptance of the written OLA, executing the CIIAA, and entering and commencing the job of President and COO—irrespective

of the eventual length of service.

23.     Reading the OLA as a whole, Mr. Russell's interpretation is correct, because:

    a.     the OLA states its general terms are not conditioned on Mr. Russell remaining employed for any specified period, *see id.*;

    b.     other than the Equity promise, all other consideration to be provided by InductEV (Base Compensation, Bonuses, Benefits, and the 401K) was made contingent upon Mr. Russell's continued employment, *see id.*; and

    c.     without the assurance he would receive stock, Mr. Russell would have been bestowing substantial benefits on InductEV (granting it a two-year Non-Disclosure, Non-Compete, and CIIAA, and delivering his lucrative intellectual property, industry contacts, and connections) without InductEV providing any mutual, non-illusory consideration.

24.     In other words, if the OLA were read to permit InductEV to hire Mr. Russell for just a moment, terminate him, and still enforce the Non-Compete, Non-Disclosure, and CIIAA for the next two years, there would be no mutuality of obligation:  InductEV would have contracted to get something while giving nothing.

25.     Mr. Russell accepted the OLA on February 24, 2023—the same day InductEV extended it—by digitally executing and returning the OLA through InductEV's DocuSign portal.

26.     Mr. Russell's electronic signature to the OLA completed its formation as an enforceable contract.  *See* NMSA §14-16-7.

27.     As offered and accepted, the OLA unambiguously requires InductEV to compensate Mr. Russell for accepting, commencing, and serving in the job title of President and COO and for executing the OLA and CIIAA with stock in the amount of 6,502,300 shares—regardless of how long thereafter he continued to serve as President and COO.

28.     In the alternative and without waiving the above contention, the OLA is ambiguous regarding any preconditions to the "Equity" award but is reasonably and fairly susceptible of the above interpretation held by Mr. Russell.

29.     InductEV intended the OLA to provide and intended that Mr. Russell interpret the OLA as providing for InductEV to compensate him for accepting, commencing, and serving in the job title of President and COO and for executing the OLA and CIIAA with stock in the amount of 6,502,300 shares—regardless of how long thereafter he continued to serve as President and COO.

30.     InductEV knew or should have known Mr. Russell interpreted the OLA as requiring InductEV to compensate him for accepting, commencing, and serving in the job title of President and COO and for executing the OLA and CIIAA with stock in the amount of 6,502,300 shares—regardless of how long thereafter he continued to serve as President and COO.

31.     Because InductEV solely drafted the OLA, ambiguities must be construed against InductEV to protect the rights of the non-drafter, Mr. Russell.  *W. Farm Bureau Ins. Co. v. Carter*, 1999-NMSC-012, ¶ 4, 127 N.M. 186, 979 P.2d 231; *Knowles v. United Servs. Auto. Ass'n*, 113 N.M. 703, 705, 832 P.2d 394, 396 (1992); *Public Serv. Co. of N.M. v. Diamond D Constr. Co.*, 2001-NMCA-082, ¶ 19, 131 N.M. 100, 33 P.3d 651.

32.     It is also common practice in this industry for persons newly hired into executive management positions to receive substantial awards of company stock (either as stock options or outright shares) as party of their compensation package.

33.     Upon information and belief, InductEV had a course of dealing and performance of committing stock shares—without a requisite term of service—to other executive management employees, including but not limited to making similar awards of stock in offer letters as inducement to other individuals hired into executive management positions.

34.     Upon information and belief, in its descriptions of equity being offered to ***other*** executive management positions, InductEV specified the offer was of "stock options" rather than

of outright shares.

35. The difference in words by which InductEV chose to describe its OLA "Equity" offer to Mr. Russell, as compared to its offers to other employees, demonstrates InductEV's actual intent was to offer Mr. Russell, and to have him believe he was being conferred, outright "shares" and not mere stock options, with no minimum period of service required.

36. In Summer 2023 (around June), Mr. Libert commented to Mr. Russell that the Company was very close to the limit of having extended all offerable equity to employees under the Capitalization or "Cap" Table. And he commented "we've got to get some of it back."

37. Thereafter, Mr. Libert in bad faith schemed to deny executive management employees of contractual expectancies including Company stock by fabricating grounds to separate employment and reneging on commitments to award such employees Company stock and/or options.

38. From February 2023 through October 2023, Mr. Russell did, in fact, fully invest his time, experience, contacts, connections, and professional status to the material advantage, advancement, and enrichment of InductEV. He delivered his end of the bargain.

39. From February 2023 through October 2023, Mr. Russell performed as President and COO in a workmanlike manner and with reasonable skill.

40. In fact, as his employment developed, Mr. Russell gained extraordinary recognition and credit from the InductEV Board of Directors, including awards of stock "options" over and above the "shares" InductEV had promised in its OLA.

41. For example, in a Board meeting on or about October 12 -13, 2023, Mr. Libert and other Directors credited Mr. Russell with having 'helped save the company' and as recognition for his contributions awarded Mr. Russell additional stock options amounting to

8

approximately .5% of the Company.

42. InductEV's documentation regarding stock "options" continued to affirm these "options" were separate from, additive to, and neither fulfilled nor superseded the award of "shares" promised in the February 24, 2023 OLA.

43. For example, the "Stock Option Grant Notice" InductEV provided Mr. Russell for various "option" grants after he entered employment included the following notice:

> Optionholder further acknowledges that **the Option Agreement** sets forth the entire understanding between Optionholder and the Company regarding the acquisition of Common Stock and **supersedes all prior oral and written agreements, promises and/or representations on that subject <u>with the exception of other equity awards previously granted to Optionholder and any written employment agreement, offer letter</u>**, severance agreement, written severance plan or policy, **<u>or other written agreement between the Company and Optionholder</u>** in each case that specifies the terms that should govern this Option.

**Exhibit 3** (InductEV "Stock Option Grant Notice" form) at 2 (emphasis added).

44. In addition, **strictly after** InductEV presented its OLA offer to Mr. Russell **and after** Mr. Russell accepted the OLA on February 24, 2023, InductEV gave Mr. Russell a copy of the Company's 2022 Equity Incentive Plan. **Exhibit 4** (InductEV "2022 Equity Incentive Plan" or "EIP"). The EIP sets some terms for "Incentive Stock Options" and "Nonstatutory Stock Options." *Id*. at 1, § 1(b). Its terms for "Options and Stock Appreciation Rights" are in Section 5. *Id*. at 5, § 5. However, the EIP, as well, confirms the Company may make "[o]ther forms of Stock Awards … either alone or in addition to Stock Awards under Section 5 and the preceding provisions of this Section 6." *Id*. at 11, § 6(c).

45. With these and other written documents, InductEV knowingly, recklessly, foreseeably, and fraudulently continued to induce Mr. Russell fully to invest his time, energy, skills, ingenuity, experience, contacts, and intellectual property in the Company with a cultivated

understanding and expectation he was receiving an ownership stake in the Company in the amount of 6,502,300 shares, **in addition to** other stock options the Company provided as further incentive during his employment.

46.     While InductEV now strains to construe other written "Option" terms in isolation or out of context to avoid this result, the established law on such matters is that "in New Mexico exculpatory clauses do not preclude liability." *Jones v. Auge*, 344 P. 3d 989, 999 (N.M. App. 2014) (quoting *Golden Cone Concepts, Inc.*, 1991-NMSC-097, ¶ 6, 113 N.M. 9, 820 P.2d 1323). A party fraudulently induced to enter into a contract "cannot be precluded from seeking redress by a provision inserted in the contract by the party perpetrating the fraud, designed to shut the mouth of the adverse party as to such fraudulent representations which led up to the making of the contract." *Id*.

47.     As Mr. Russell's standing with the Company rose, Mr. Libert began resenting his success and growing profile.  And eventually, Mr. Libert began attempting to pressure Mr. Russell out of the Company on false and pretextual grounds.

48.     On October 23, 2023, Mr. Libert and Board member Dave Rosenfeld met with Mr. Russell in the Detroit area.  The meeting was positive.  Mr. Russell had to go to another meeting in the area with a potential InductEV client.  While there, Mr. Russell received a call from Mr. Libert, with the latter claiming he had just received a negative report from coworkers about Mr. Russell's working relationship with Jason Stolnis.

49.     In late October 2023, Mr. Libert advised Mr. Russell it was necessary for him to leave employment—initially proposing to keep Mr. Russell as a full-time employee with full benefits through the end of December 2023 and thereafter to provide "equitable severance."

50.      But when Mr. Russell through counsel (on November 2, 2023 at 12:57 p.m.)

made written inquiry on the status of the 6,502,300 shares promised in the parties' original OLA, Mr. Libert (in a 1:20 p.m. text the same day) angrily withdrew his prior proposal and stated, "My offer is now $1."

51.     Despite notice of and opportunity to cure these breaches, InductEV failed and refused to deliver Mr. Russell the duly earned benefit of their bargain, for which he now sues.

CAUSES OF ACTION

COUNT I – BREACH OF CONTRACT

52.     Plaintiff incorporates as if fully set forth herein the preceding allegations of paragraphs 1 through 51.

53.     Through the above sequence of events, InductEV entered a contract and legally enforceable promise in the form of the OLA.

54.     InductEV transmitted the OLA to Mr. Rusell on February 24, 2023.

55.     InductEV's transmission of the OLA on February 24, 2023 constituted a written offer, identifying and supported by specified considerations including all material terms for a contract of employment.

56.     InductEV did not require a particular manner or time of accepting the OLA, other than signing, dating, and returning the OLA.

57.     At no time prior to Mr. Russell's acceptance of the OLA did InductEV modify or revoke the offer.

58.     By electronic acceptance, signature, and delivery of the OLA to InductEV on or February 24, 2023, Mr. Russell timely accepted the OLA without any modifications.

59.     By the above actions, InductEV and Mr. Russell mutually assented to a contract of employment subject to the terms of the OLA.

60. The OLA provided there could be no modification or amendment of its terms except by a written agreement signed by InductEV and Mr. Russell.

61. The parties never made a written agreement to modify or amend the number of shares InductEV owes Mr. Russell for accepting, commencing, and faithfully performing his employment with InductEV for a period of 10 months.

62. Pursuant to the OLA, InductEV owes and Mr. Russell owns 6,502,300 shares of InductEV stock.

63. The parties ended their employment relationship effective October 31, 2023.

64. On dates before and/or including November 2, 2023, Mr. Russell made demands, including in writing, for InductEV to deliver the due 6,502,300 shares of InductEV stock.

65. For 60 days since Mr. Russell's written demand, InductEV has failed and refused to deliver or affirm commitment to deliver the 6,502,300 shares of InductEV stock.

66. Despite a written demand and expiration of reasonable time to comply and to perform, InductEV has not met its contractual obligation to deliver Mr. Russell 6,502,300 shares of InductEV stock.

67. InductEV has both failed to perform and announced it will not perform its contractual obligation under the OLA to deliver Mr. Russell 6,502,300 shares of InductEV stock.

68. InductEV has withheld the 6,502,300 shares of Company stock without legal excuse or justification.

69. Withholding the 6,502,300 shares of InductEV is a material breach of the OLA.

70. Mr. Russell has incurred direct damages naturally and necessarily arising from InductEV's breach, including but not limited to the loss of 6,502,300 shares of InductEV stock, as well as consequential and incidental damages, for which he now sues.

71.     Mr. Russell is entitled to specific performance of InductEV's actual or apparent promise of 6,502,300 shares because the OLA specified the compensation as shares, rather than a corresponding monetary value; because Mr. Russell by his own contributions of "sweat equity" significantly increased the value of those shares (comparable to a land purchaser having 'taken possession of the property' and 'made valuable, permanent, and substantial improvements' in other specific-performance jurisprudence); because the value of InductEV as a startup has significant potential value to hold as stock; and because Mr. Russell has no adequate alternative remedy at law in damages.

72.     Alternatively, if the Court finds specific performance unavailable, Mr. Russell is entitled to monetary damages based on a favorable valuation of the shares, taking into account factors such as potential terms of purchase by a prospective buyer of InductEV.

## COUNT II – FRAUD IN THE INDUCEMENT OF CONTRACT

73.     Plaintiff incorporates as if fully set forth herein the preceding allegations of paragraphs 1 through 72.

74.     In addition or in the alternative to his above cause of action to enforce the OLA in Contract, Mr. Russell states as follows.

75.     Through the above sequence of events, InductEV entered a contract and legally enforceable promise in the form of the OLA.

76.     With written promise that Mr. Russell would receive compensation including 6,502,300 shares of Company Stock regardless of the duration of his employment, InductEV knowingly, recklessly, foreseeably, and fraudulently induced Mr. Russell:

        a.      to enter the OLA;
        b.      to accept employment as President and COO;
        c.      to invest his time, energy, skills, ingenuity, experience, contacts, and

13

intellectual property in the Company; and

    d.    to enter the CIIAA, which:

        i.    precludes him from working in any Competitive Position for a period continuing twenty-four (24) months following any termination of his employment by either InductEV or Mr. Russell; and

        ii.    further assigns to InductEV all intellectual property in any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, or know-how Mr. Russell developed while employed with InductEV.

77.    InductEV knowingly, recklessly, foreseeably, and fraudulently induced Mr. Russell to believe their contract entitled him to 6,502,300 shares of InductEV stock upon his acceptance of the written OLA, executing the CIIAA, and entering and commencing the job of President and COO—irrespective of the eventual length of service.

78.    InductEV's promise to deliver 6,502,300 shares of InductEV stock irrespective of Mr. Russell's length of service was a material term of the OLA.

79.    Mr. Russell reasonably and detrimentally relied upon InductEV's actual and apparent promise to deliver 6,502,300 shares of InductEV stock irrespective of Mr. Russell's length of service by:

    a.    entering the OLA;
    b.    accepting employment as President and COO;
    c.    investing his time, energy, skills, ingenuity, experience, contacts, and intellectual property in the Company; and
    d.    entering the CIIAA, which:

        i.    precludes him from working in any Competitive Position for a period continuing twenty-four (24) months following any termination of his employment by either InductEV or Mr. Russell; and

        ii.    further assigns to InductEV all intellectual property in any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, or know-how Mr. Russell developed while employed with InductEV.

80.    InductEV knowingly, recklessly, foreseeably, and fraudulently entered the OLA with an intention not to honor its promise to deliver him 6,502,300 shares of InductEV stock

irrespective of his length of service.

81.    InductEV has not, in fact, honored its actual and apparent promise to deliver him 6,502,300 shares of InductEV stock irrespective of his length of service.

82.    As a party to the OLA, Mr. Russell elects to affirm and enforce it, compelling InductEV to render specific performance by delivering and transferring to his ownership 6,502,300 shares of InductEV stock.

83.    Alternatively, if the Court finds specific performance unavailable as a remedy for InductEV's fraudulent inducement, Mr. Russell is entitled to monetary damages based on a favorable valuation of the shares, taking into account factors such as potential terms of purchase by a prospective buyer of InductEV.

84.    Further and/or in the alternative, if the Court finds no enforceable contract or alternative right of Mr. Russell to recover the 6,502,300 shares of stock as payable regardless of the length of service, Mr. Russell is entitled to void the OLA, including the ancillary CIIAA; to receive a declaratory judgment and injunction to the effect that the CIIAA is null and void and shall not be threatened or enforced by InductEV, as set forth below; and to receive damages including but not limited to the value of 6,502,300 shares of InductEV stock under his alternate theories of misrepresentation, promissory estoppel, and unjust enrichment.

COUNT III – MISREPRESENTATION

85.    Plaintiff incorporates as if fully set forth herein the preceding allegations of paragraphs 1 through 84.

86.    As parties to a contract (the OLA), InductEV owed Mr. Russell a duty to perform, or offer to perform, each of its contractual promises, unless such performance was dispensed with or excused under the provisions of the contract.

87.     In addition, in its communications and negotiations with Mr. Russell to form the

OLA and on which InductEV intended Mr. Russell materially and substantially to rely, InductEV

owed Mr. Russell a duty of ordinary care, including a duty to make its commitments reasonably

clear and to refrain from making false and misleading statements.

88.     In addition or in the alternative to Plaintiff's other allegations herein, InductEV

breached its duties of care and made a material misrepresentation of fact to Mr. Russell—that

Mr. Russell would receive stock in the amount of 6,502,300 shares, regardless of how long he

continued to serve as President and COO.

89.     Mr. Russell reasonably relied upon such representation by:

a.      entering the OLA;
b.      accepting employment as President and COO;
c.      investing his time, energy, skills, ingenuity, experience, contacts, and
intellectual property in the Company; and
d.      entering the CIIAA, which:
  i.      precludes him from working in any Competitive Position for a
  period continuing twenty-four (24) months following any termination of his
  employment by either InductEV or Mr. Russell; and
  ii.     further assigns to InductEV all intellectual property in any
  invention, modification, discovery, design, development, improvement, process,
  software program, work of authorship, documentation, formula, data, technique,
  or know-how Mr. Russell developed while employed with InductEV.

90.     InductEV knew the representation was false at the time it was made or made it

recklessly.

91.     InductEV should have known the representation was false at the time it was made.

92.     InductEV intended to induce Mr. Russell to rely on such representation.

93.     As a direct, proximate, and foreseeable result of InductEV's misrepresentation

and Mr. Russell's reasonable, detrimental reliance, InductEV has been unjustly enriched and Mr.

Russell has incurred direct, foreseeable damages, which he is now entitled to recover and herein

seeks, including the loss of his expectancy of 6,502,300 InductEV shares and the reasonable value and InductEV's profits from his service as President and COO; his investment of time, energy, skills, ingenuity, experience, contacts, and intellectual property in the Company; his commitments to InductEV under the CIIAA, including his promise to forego any Competitive Position for a period continuing twenty-four (24) months following termination, and his assignment to InductEV of all intellectual property in any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, or know-how Mr. Russell developed while employed with InductEV.

COUNT IV – PROMISSORY ESTOPPEL

94.     Plaintiff incorporates as if fully set forth herein the preceding allegations of paragraphs 1 through 93.

95.     In the OLA, InductEV made a promise to Mr. Russell that he would receive 6,502,300 in InductEV stock in exchange for his accepting and commencing service (irrespective of the eventual length of service) in the position of President and COO; his investment of time, energy, skills, ingenuity, experience, contacts, and intellectual property in the Company; and his commitments to InductEV under the CIIAA, including his promise to forego any Competitive Position for a period continuing twenty-four (24) months following termination, and his assignment to InductEV of all intellectual property in any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, or know-how Mr. Russell developed while employed with InductEV.

96.     Mr. Russell relied on InductEV's promise of 6,502,300 in InductEV stock by

accepting and commencing service in the position of President and COO; by investing his time, energy, skills, ingenuity, experience, contacts, and intellectual property in the Company; and by his written commitments to InductEV under the CIIAA, including his promise to forego any Competitive Position for a period continuing twenty-four (24) months following termination, and his assignment to InductEV of all intellectual property in any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, or know-how Mr. Russell developed while employed with InductEV.

97.    It was reasonable for Mr. Russell to rely on InductEV's promise of 6,502,300 in InductEV stock by accepting and commencing service in the position of President and COO; by investing his time, energy, skills, ingenuity, experience, contacts, and intellectual property in the Company; and by his written commitments to InductEV under the CIIAA, including his promise to forego any Competitive Position for a period continuing twenty-four (24) months following termination, and his assignment to InductEV of all intellectual property in any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, or know-how Mr. Russell developed while employed with InductEV.

98.    InductEV's promise of 6,502,300 in InductEV stock caused Mr. Russell to change his position by foregoing other contracting or employment opportunities; by accepting and commencing service in the position of President and COO; by investing his time, energy, skills, ingenuity, experience, contacts, and intellectual property in the Company; and by his written commitments to InductEV under the CIIAA, including his promise to forego any Competitive Position for a period continuing twenty-four (24) months following termination, and his

assignment to InductEV of all intellectual property in any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, or know-how Mr. Russell developed while employed with InductEV.

99.     This change in position by Mr. Russell was substantial.

100.     InductEV knew or should have known that Mr. Russell would make this substantial change in position after and in reliance on InductEV's promise of 6,502,300 in InductEV stock.

101.     It was foreseen and reasonably foreseeable to InductEV when transmitting the OLA that Mr. Russell:

    a.      would interpret the OLA as entitling him to 6,502,300 stock shares irrespective of his eventual term of service; and
    b.      would substantially change his position in reliance on the promise or apparent promise of 6,502,300 stock shares being payable irrespective of his eventual term of service.

102.     Enforcement of the promise of 6,502,300 stock shares is required to prevent injustice.

103.     Mr. Russell is entitled to his reliance damages including but not limited to receiving 6,502,300 shares of InductEV stock or, if the Court should so determine, monetary damages based on a favorable valuation of the shares, taking into account factors such as potential terms of purchase by a prospective buyer of InductEV.

COUNTY V – INTERFERENCE WITH CONTRACT

104.     Plaintiff incorporates as if fully set forth herein the preceding allegations of paragraphs 1 through 103.

105.     InductEV, by and through the actions of its highest executive officer, CEO

19

Libert—for which InductEV is an alter-ego and vicariously liable—engaged in unjustified and unprivileged interference with Mr. Russell's rights under the OLA.

106.    As CEO of InductEV, Mr. Libert has and had actual authority to hire and fire Mr. Russell.

107.    Before they purported to terminate Mr. Russell, Mr. Libert and InductEV had "knowledge of the contract" between Mr. Russell and InductEV.

108.    InductEV, by and through the oversight, conduct, and actual or imputable knowledge of its Board, was aware of the conflict of interest providing Mr. Libert personal motive to fabricate grounds to breach existing contractual obligations and to withhold the substantial Equity ownership fractions promised and payable to other members of InductEV's executive management team.

109.    "Since a corporation can act only through its officers, agents and employees, it is necessarily chargeable with the composite knowledge of its officers and agents acting within the scope of their authority." *Sawyer v. Mid-Continent Petroleum Corp.*, 236 F.2d 518, 520 (10th Cir. 1958 (applying New Mexico law) (citing 19 C.J.S., Corporations, § 1081, p. 618); *Trinity Universal Ins. Co. v. Rocky Mountain Wholesale Co.*, 353 F.2d 574, 577 (10th Cir. 1965) (applying New Mexico law); Restatement (Second), Agency, § 275.

110.    The scienter of senior controlling officers of a corporation may be attributed to the corporation itself to establish liability when those senior officials were acting within the scope of their apparent authority. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106-07 (10th Cir. 2003) (citing *Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001) (holding that the scienter of an agent of a corporate defendant is attributable to the corporation as a primary violator of § 10(b) and Rule 10b-5 of the Securities Exchange Act

of 1934); *Cromer Finance Ltd. v. Berger*, Nos. 00 Civ. 2284(DLC) & 00 Civ. 2498(DLC), 2002 WL 826847, at *7-8 (S.D.N.Y. May 2, 2002) (holding that scienter of partner of accounting firm could be imputed to the firm itself under traditional agency principles); *In re JDN Realty Corp. Sec. Litig.*, 182 F.Supp.2d 1230, 1246 (N.D.Ga.2002) (holding that scienter of chief executive officer of defendant corporation was attributable to the corporation); 2 Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 12.8[4], at 444 (4th ed. 2002) ("[K]nowledge of a corporate officer or agent acting within the scope of authority is attributable to the corporation.").

111.     InductEV refused performance of the OLA, including but not limited to InductEV's obligation to deliver Mr. Russell 6,502,300 shares of stock.

112.     Actions Mr. Libert took within the course and scope of his actual authority on behalf of InductEV "played an active and substantial part" in causing Mr. Russell to lose the benefits of his contract.

113.     Actions Mr. Libert took for personal, unlawful motives on behalf of InductEV— but as to which motives InductEV also was or should have been aware—also "played an active and substantial part" in causing Mr. Russell to lose the benefits of his contract.

114.     Regardless of the state of its knowledge of Mr. Libert's personal, bad-faith motives to undermine Mr. Russell prior to the moment that Mr. Libert moved to terminate Mr. Russell, the Board of InductEV has in subsequent time gained additional knowledge of any has yet affirmed and ratified Mr. Libert's bad-faith interference with and breach of contractual obligations to Mr. Russell.

115.     Mr. Libert and InductEV induced the breach without justification or privilege to do so.

116.     Damages flowed from the breached contract, including but not limited to

InductEV having been unjustly enriched and Mr. Russell having sacrificed or lost his expectancy of 6,502,300 InductEV shares and the reasonable value and InductEV's profits from his service as President and COO; his investment of time, energy, skills, ingenuity, experience, contacts, and intellectual property in the Company; his commitments to InductEV under the CIIAA, including his promise to forego any Competitive Position for a period continuing twenty-four (24) months following termination, and his assignement to InductEV of all intellectual property in any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, or know-how Mr. Russell developed while employed with InductEV.

117.    Alternatively, if the Court finds specific performance unavailable as a remedy for InductEV's fraudulent inducement, Mr. Russell is entitled to monetary damages based on a favorable valuation of the shares, taking into account factors such as potential terms of purchase by a prospective buyer of InductEV.

118.    Further and/or in the alternative, if the Court finds no enforceable contract or alternative right of Mr. Russell to recover the 6,502,300 shares of stock as payable regardless of the length of service, Mr. Russell is entitled to void the OLA, including the ancillary CIIAA; to receive a declaratory judgment and injunction to the effect that the CIIAA is null and void and shall not be threatened or enforced by InductEV, as set forth below; and to receive damages including but not limited to the value of 6,502,300 shares of InductEV stock under his alternate theories of misrepresentation, promissory estoppel, and unjust enrichment.

## COUNT VI – DECLARATORY RELIEF

119.    Plaintiff incorporates as if fully set forth herein the preceding allegations of paragraphs 1 through 118.

120.     On the above grounds, a case of actual controversy exists between InductEV and Mr. Russell, and such case is within this Court's jurisdiction.

121.     With this Complaint, Mr. Russell has filed an appropriate pleading seeking and prompting this Court to declare the rights and other legal relations of Mr. Russell under the OLA and the CIIAA.

122.     Pursuant to 28 U.S.C. § 2201, this Court should declare Mr. Russell is entitled to receive and InductEV is compelled specifically to perform its promise to deliver and transfer to Mr. Russell ownership 6,502,300 shares of InductEV stock.

123.     Alternatively, if the Court finds specific performance unavailable as a remedy for InductEV's fraudulent inducement, pursuant to the same authority, this Court should declare Mr. Russell is entitled to monetary damages based on a favorable valuation of the shares, taking into account factors such as potential terms of purchase by a prospective buyer of InductEV.

124.     Further and/or in the alternative, if the Court finds no enforceable contract or alternative right of Mr. Russell to recover the 6,502,300 shares of stock as payable regardless of the length of service, pursuant to the same authority, this Court should declare Mr. Russell is entitled to void the OLA, including the ancillary CIIAA; to receive a declaratory judgment and injunction to the effect that the CIIAA is null and void and shall not be threatened or enforced by InductEV, as set forth below; and to receive damages including but not limited to the value of 6,502,300 shares of InductEV stock under his alternate theories of misrepresentation, promissory estoppel, and unjust enrichment.

## COUNT VII – EQUITABLE RELIEF

125.     Plaintiff incorporates as if fully set forth herein the preceding allegations of paragraphs 1 through 124.

126.     On the above grounds, the respective rights and obligations of InductEV and Mr. Russell following termination of their OLA present an extreme case of pressing necessity.

127.     Mr. Russell has shown irreparable injury as a result of having been induced to invest in and to enrich InductEV with his personal labor and service as President and COO; his investment of time, energy, skills, ingenuity, experience, contacts, and intellectual property in the Company; his commitments to InductEV under the CIIAA, including his promise to forego any Competitive Position for a period continuing twenty-four (24) months following termination, and his assignment to InductEV of all intellectual property in any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, or know-how Mr. Russell developed while employed with InductEV.

128.     With InductEV having been unjustly enriched in these respects as a result of Mr. Russell's detrimental reliance on InductEV's now-dishonored promise of 6,502,300 shares; with specific performance of such promise being necessary for the reasons set forth in paragraph 71, *supra*; and with InductEV still being possessed of the benefits provide by Mr. Russell and the rights under its CIIAA, there is a showing of irreparable injury for which there is no adequate and complete remedy at law.

129.     The 6,502,300 shares in question were and are a very substantial part of the compensation due and owing to Mr. Russell under the OLA.

130.     Due to InductEV withholding said shares, InductEV cannot claim to have rendered to Mr. Russell a very substantial part of the compensation due and owing under the OLA.

131.     In *quantum meruit*, an award to Mr. Russell of 6,502,300 shares of InductEV

stock, or a sum equaling a favorable valuation of such shares, is necessary and due to prevent unjust enrichment of InductEV.

132.    For reasons shown, this Court should declare Mr. Russell is entitled to receive and InductEV is compelled specifically to perform its promise and to deliver and transfer to Mr. Russell ownership 6,502,300 shares of InductEV stock.

133.    Alternatively, if the Court finds specific performance unavailable as a remedy for InductEV's fraudulent inducement, pursuant to the same authority, this Court should declare Mr. Russell is entitled to monetary damages based on a favorable valuation of the shares, taking into account factors such as potential terms of purchase by a prospective buyer of InductEV.

134.    Further and/or in the alternative, if the Court finds no enforceable contract or alternative right of Mr. Russell to recover the 6,502,300 shares of stock as payable regardless of the length of service, pursuant to the same authority, this Court should declare Mr. Russell is entitled to void the OLA, including the ancillary CIIAA; and enjoin InductEV from threatening or enforcing any rights under the CIIAA.

## **PRAYER FOR RELIEF**

135.    WHEREFORE, Plaintiff requests that the Court find Defendant is liable and order Plaintiff be awarded the damages and equitable relief herein referenced, including but not limited to:

      A.    specific performance of InductEV's promise to grant Mr. Russell 6,502,300 shares of InductEV company stock;

      B.    damages, including but not limited to the expectancy value of 6,502,300 shares of InductEV company stock; unpaid or underpaid wages; back and front pay and benefits; pre- and post-judgment interest as permitted by law; emotional distress; costs and reasonable attorneys' fees; and any such other and further relief as the Courts deems just and proper;

C.     equitable relief including:

      1.     awards of the same amounts for unjust enrichment;

      2.     a judicial declaration that InductEV is not entitled to enforce and is enjoined from threatening or taking action to enforce any provisions of the CIIAA, including but not limited to the Non-Compete and Intellectual-Property-Assignment provisions of their CIIAA;

D.     costs, expenses, and attorney fees; and

E.     such other and further relief as this Court should find just and proper.

JURY DEMAND

136.   Plaintiff Albert "Chuck" Russell hereby demands trial by jury on all issues so triable.

Filed this 3rd day of January, 2024.

                       Respectfully Submitted,

                       *-/s/ - Trent A. Howell –*
                       *Electronically filed & signed-*
                       Attorney Trent A. Howell
                       P.O. Box 2304
                       Santa Fe, New Mexico  87504
                       trent@trentahowell.com
                       (505) 919-9158

                       *Counsel for Plaintiff Albert "Chuck" Russell*